IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANTHONY PORTERFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-147-SLR |
| | ) | |
| DR. JOHN DURST, DR. DALE | ) | |
| RODGERS and CORRECTIONAL | ) | |
| MEDICAL SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

---

Michael Pileggi, Esquire, Philadelphia, Pennsylvania and Edward J. Fornias, Esquire of Roeberg, Moore & Friedman, P.A., Wilmington, Delaware.  Counsel for Plaintiff.

Kevin J. Connors, Esquire, of Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware.  Counsel for Defendants.

---

**MEMORANDUM OPINION**

Dated:  December 16, 2008
Wilmington, Delaware

*[signature]*

**ROBINSON, District Judge**

## I. INTRODUCTION

In March 2007, plaintiff Anthony Porterfield (an incarcerated individual

proceeding pro se) filed suit for damages under 42 U.S.C. § 1983 against multiple

defendants, alleging denial of medical care, inadequate medical care, failure to

diagnose, deliberate indifference and cruel and unusual punishment, all in violation of

the Eighth Amendment of the United States Constitution.  (D.I. 2)  In June 2007, plaintiff

(now represented by counsel) filed an amended complaint alleging denial of medical

treatment, pursuant to 42 U.S.C. § 1983.  (D.I. 14)  At the close of discovery, the

remaining medical defendants - Correctional Medical Services, Inc. ("CMS"), Dr. Dale

Rodgers and Dr. John Durst - filed a motion for summary judgment.  (D.I. 48)  The

motion is ripe for review.[1]

The court has jurisdiction over these matters pursuant to 28 U.S.C. § 1331.

## II. FACTS[2]

On July 7, 2005, plaintiff's left index finger was injured when the tray slot door to

his cell was slammed shut by a correctional officer.  Plaintiff thereafter submitted

---

[1]The court notes in this regard that defendants did not file a brief in support of
their motion, pursuant to D. Del. LR 7.1.3(c), but chose instead to file a paper captioned
"memorandum of points and authorities" as an attachment to their motion.  (D.I. 48)  In
violation of D. Del. LR 7.1.3(b), defendants' paper is 23 un-numbered pages long and
includes an extensive recitation of the facts and legal argument.  In the future, any such
similar filings shall be disregarded by the court, consistent with D. Del. LR 5.1.2.

[2]The court notes in this regard that neither party submitted plaintiff's complete
medical record; the court resorted to collating both of the submitted appendices (D.I.
49, exs. A-L, O-P; D.I. 51, exs. 1-37) in order to fashion a time line of the relevant
events.  Therefore, the court will not recite specifically to the parties' submissions, but
will simply recite the facts.

several requests for medical services and was seen by medical personnel on August 21, 2005.  On September 1, 2005, plaintiff submitted a grievance report concerning his "broken" finger whereby the remedy requested was "[t]o receive necessary medical treatment."  On September 16, 2005, plaintiff's finger was examined, with a diagnosis of "displaced avulsion fracture at the base of distal phalanx and subluxation of corresponding interphalangeal joint with some overlying soft tissue swelling."  A "memo" sent to plaintiff from CMS on September 29, 2005 read:  "Just wanted to let you know that your x-ray results [c]ame back normal findings."

Plaintiff's finger continued to be painful.  On November 3, 2005, he was prescribed "Motrin" to relieve the pain.  Plaintiff filed a medical grievance on November 16, 2005, and was referred for a consultation with a specialist in December 2005, who confirmed the diagnosis and recommended surgery in a report dated December 2, 2005.  Plaintiff's prescription for Motrin was refilled on December 8, 2005.

In January and February 2006, plaintiff wrote letters to the Warden and Deputy Warden requesting their assistance in getting medical treatment.  On February 17, 2006, plaintiff saw Dr. Richard DuShuttle who also reported that surgery was required.  By letter dated March 14, 2006, CMS approved the surgery.  On April 19, 2006, some nine months after the initial injury, plaintiff underwent a "fusion of his left index finger with pinning and synthetic bone graft."

Post-surgery, plaintiff was seen by CMS medical personnel on multiple occasions during the month of May.  On May 11, 2006, no problems were noted in a follow-up visit with Dr. DuShuttle.  By May 15, 2006, however, the pins had to be removed early because of an obvious infection at the pin site.  Dr. DuShuttle opined

3

that the early removal of the pins meant that plaintiff's results would not be as good as otherwise expected.  Dr. DuShuttle applied a velcro finger splint and ordered "IV antibiotics, Keflex 1 gram Q8 hrs."[3]  By May 22, 2006, a consultation report reflected that plaintiff's finger was showing signs of improvement; he was to continue "IV antibiotics, Keflex 1 gram Q8 hrs."  A follow-up was recommended in one-week's time.

Plaintiff saw Dr. DuShuttle again on June 6, 2006.[4]  An x-ray of plaintiff's finger was taken in the office.  "Bone deterioration of distal phalanges" was noted and a bone scan was recommended to rule out osteomyelitis.[5]  Plaintiff continued to be seen by CMS personnel on a regular basis through the month of June.

On July 6, 2006, a MRI of plaintiff's left index finger was taken.  The findings thereof were deemed "consistent with osteomyelitis of the distal and middle phalanges of the index finger given the suspicion of infection."  Plaintiff was examined by Dr. DuShuttle on July 18, 2006.  For the first time, amputation of plaintiff's finger was mentioned.  Plaintiff continued to be monitored by CMS medical personnel through the months of July and August.

---

[3]Plaintiff alleges that Dr. Durst administered Ancef rather than Keflex.

[4]In connection with this office visit, the record includes a note that plaintiff "admits to not being in the most sterile environment.  We had to give him a new Velcro finger splint today because of how dirty his previous one was."

[5]"[A]n infectious usually painful inflammatory disease of bone often of bacterial origin that may result in the death of bone tissue." *Merriam-Webster Online Dictionary.* 2008.  Merriam-Webster Online.  16 December 2008.

4

By the end of August 2006, it had been determined that plaintiff's finger had to be amputated, which surgery was conducted in October 2006.  Plaintiff continued to be monitored by CMS medical personnel through the month of October.

## III.  STANDARD OF REVIEW

### A.  Summary Judgment

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  However, a party opposing summary judgment

"must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  To survive a motion for summary judgment, plaintiff cannot rely merely on the unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.  Eighth Amendment Violations

In the context of medical care, an act of a prison official only becomes a constitutional violation when it results from the "deliberate indifference to a prisoner's serious illness or injury." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  Therefore, in order to set forth a cognizable claim under the Eighth Amendment, an inmate must prove (1) a serious medical need and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.  *Id.* at 104; *Rouse v. Plantier*, 182 F.3d 192, 107 (3d Cir. 1999).  As further explained by the Supreme Court in *Estelle*, because

> an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind" . . . , a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Id.* at 105-106.  Consequently, a mere difference of opinion concerning the treatment

received by an inmate is not actionable under the Eighth Amendment and § 1983.  *See*

*Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

The "deliberate indifference" prong of the *Estelle* test is satisfied only when the

inmate demonstrates that the medical provider acted to deny the inmate's reasonable

request for medical treatment (thus subjecting the inmate to undue suffering) or if

medical treatment is delayed for non-medical reasons.  *Monmouth County Correctional*

*Inst. Inmates v. Lanzaro*, 834 F.3d 326, 346-47 (3d Cir. 1987).  To put the point

differently, a prison official's conduct does not constitute a "deliberate indifference"

unless it is alleged to occur in conjunction with the requisite mental state.  In this regard,

a prison official is deliberately indifferent if he knows that an inmate faces a substantial

risk of serious harm and fails to take reasonable steps to avoid the harm.  *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994).  A prison official may manifest deliberate

indifference by "intentionally denying or delaying access to medical care."  *Estelle*, 429

U.S. at 104-105.

Finally, an inmate "has no right to choose a specific form of medical treatment,

so long as the treatment provided is reasonable."  *Blackston v. Corr. Med. Servs., Inc.*,

499 F. Supp. 2d 601, 605 (D. Del. 2007).  Thus,

> [a]n inmate's claims against members of a prison medical department
> are not viable under § 1983 where the inmate receives continuing care,
> but believes that more should be done by way of diagnosis and treatment
> and maintains that options available to medical personnel were not
> pursued on the inmate's behalf.

*Id. Accord Estelle*, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").

## IV. ANALYSIS

The chronology of relevant events is not in dispute. Rather, the legal consequences of such events is contested.

Plaintiff asserts that too little care was administered between the date of his initial injury (July 2005) and the date of his initial surgery (April 2006); according to plaintiff, this delay subjected him to undue suffering. Plaintiff further asserts that the care administered by defendants after the date of his initial surgery (April 2006) was so deficient as to have caused the infection that required amputation of his finger in October 2006.

Defendants argue that plaintiff was seen "by numerous CMS doctors, nurse practitioners, physician's assistants, and outside specialists" and that defendants "properly coordinated plaintiff's care with the outside healthcare provider, Dr. DuShuttle." According to defendants, because plaintiff has not produced any expert who has opined that defendants are responsible in any way for causing plaintiff's osteomyelitis, summary judgment should be awarded to them.

With respect to the individual defendants, they are each mentioned in connection with a single course of conduct. Dr. Durst is alleged to have administered the antibiotic Ancef rather than Keflec; Dr. Rodgers is alleged to have prescribed physical therapy post-surgery. Although plaintiff claims that the above described conduct contributed to his injury, there is no evidence of such. Indeed, this conduct falls within the ambit of

medical judgment and, therefore, defendants' motion for summary judgment is granted as to defendants Durst and Rodgers.

With respect to defendant CMS, there can be no doubt that plaintiff has proven a serious medical need.  The question that remains is whether there are genuine issues of material fact that relate to the second prong of the *Estelle* test, that is, whether CMS was "deliberately indifferent" to plaintiff's serious medical need.  Although CMS personnel did see plaintiff, the court's lingering discomfort with the record has to do with the objective evidence that:  (1)  plaintiff was not given an honest report of the initial diagnosis; (2) consultation with and surgery by a specialist took nine months to accomplish; and (3) plaintiff's finger was infected within a month of surgery, with the outside consultant noting plaintiff's dirty splint months before the infection led to amputation of the finger.  In sum, the overall course of treatment administered to plaintiff by CMS personnel between July 2005 and October 2006 raises concerns of a constitutional dimension.  The record, such as it is, is difficult to discern and the court is not prepared to enter judgment in favor of CMS when it is not clear what CMS personnel did, or did not, do during this 15-month medical saga.[6]

## V.  CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted in part and denied in part.  An appropriate order shall issue.

---

[6]The court is satisfied that plaintiff exhausted his administrative remedies.